IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TODD MICHAEL LUSHER, | ) | Case No. 1:17-cv-01947 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

## I.      Introduction

Plaintiff, Todd Michael Lusher, seeks judicial review, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). The parties have consented to my jurisdiction. ECF Doc. 11.

Because (i) the ALJ properly applied the treating source rule and (ii) substantial evidence supports the ALJ's analysis at Step Two regarding plaintiff's migraine headache conditions, the commissioner's decision must be AFFIRMED.

## II.      Procedural History

Administrate Law Judge Joseph G. Hajjar denied Plaintiff, Todd Michael Lusher's application for disability insurance benefits ("DIB"), alleging disability beginning on December 13, 2013. (Tr. 12) Lusher's DIB claim was denied initially on December 11, 2014 and upon reconsideration on March 27, 2015. (*Id.*) Lusher filed a written request for rehearing, and

appeared and testified at a hearing on April 27, 2016. (*Id.*) After the hearing, Lusher's counsel submitted two post hearing briefs and additional medical evidence. (*Id.*) The Appeals Council denied Lusher's request for review on July 26, 2017, leaving the ALJ's decision as the final decision of the Social Security Commissioner. 20 C.F.R. § 416.1481; Tr. 1-4.

## III. Evidence

Lusher now raises two arguments: (1) the ALJ committed legal error in how he evaluated the opinions of Dr. Pedro, Lusher's treating physician, and (2) the ALJ erred by failing find Lusher's migraine headache condition to be a severe impairment at Step Two of the sequential analysis and by not accounting for it in his RFC finding. *See* ECF Doc. 12, Page ID# 895, 906.

### A. Relevant Personal, Educational, and Vocational Evidence

Lusher was 52 years old on the date of the administrative hearing. (Tr. 121) He was a high school graduate and who'd had two or three years of college work. (Tr. 123, 299, 671) He worked as an iron worker from 1986 until December 2013, his alleged onset date. (Tr. 299)

### B. Medical Evidence

Lusher met with Norman T. Sese, M.D. multiple times from September 22, 2010 through July 31, 2012 regarding his complaints of migraine headaches (Tr. 429, 431-40), dizziness (Tr. 439, 442), depression (Tr. 438), sleep apnea (Tr. 434, 438), and vertigo. (Tr. 429, 440-42) Lusher reported that his headaches were accompanied by nausea and sometimes photophobia or phonophobia. (Tr. 439) Lusher reported he went to the emergency room for a headache in January of 2011 and a CT scan of his brain came back negative. (Tr. 436-37) An MRI of Lusher's brain was also "unremarkable." (Tr. 435) A spinal tap was negative for oligoclonal bands. (Tr. 441) Lusher reported that hot weather sometimes exacerbated his headaches (Tr. 434), and but Topamax helped with headaches. (Tr. 433-35) Dr. Sese later changed Lusher's prescription from Topamax to Neurontin, because, Topamax had caused side effects. (Tr. 432,

433)  Lusher reported that his headaches were well controlled with Neurontin 300 mg once daily (Tr. 429, 431) and that he was very happy with that drug regimen.  (Tr. 431)  On examination, Dr. Sese found Lusher's cranial nerves were intact, he moved all four extremities spontaneously, there was no focal motor weakness, his Romberg sign was negative, and his gait was steady. (Tr. 429, 431-35, 438-40)

Abraham Pedro, M.D. treated Lusher several times between June 8, 2011 and July 31, 2012 (Tr. 404-405, 408-415) for hypertension (Tr. 408), hyperlipidemia (Tr. 408), erectile dysfunction (Tr. 404, 411, 413), anxiety (Tr. 404, 411, 413), depression (Tr. 411, 413), agitation (Tr. 413), depressed mood (Tr.413), anhedonia (Tr. 413), headaches (Tr. 415), fatigue (Tr. 415), and feelings of helplessness (Tr. 415).  Lusher denied having any back pain, dizziness, gait instability, tremors, or headaches.  (Tr. 404)  On June 8, 2011, Lusher reported he had been having persistent headaches "since he has been exposed to sunlight" and Dr. Pedro advised him to follow-up with Dr. Sese.  (Tr. 408-09)  He reported he didn't fill his prescription for Xanax to avoid becoming addicted.  (Tr. 413)  Dr. Pedro diagnosed hypogonadism, erectile dysfunction, dysuria, proctalgia, fatigue and malaise, hypertension, hyperlipidemia, coronary artery disease, anxiety disorder, and depression.  (Tr. 405, 408)  Dr. Pedro's examination findings were generally normal.  (Tr. 404, 411, 413, 415)  Dr. Pedro recommended diet change and exercise. (Tr. 404, 411)  He prescribed Cymbalta, Toprol, Lotrel, Staxyn, Xanax, and Lexapro.  (Tr. 405, 409, 413, 415)

On September 25, 2013, Lusher treated at MetroHealth Medical Center for a workplace leg fracture.  (Tr. 619)  By November 21, 2013 the fracture was fully healed.  (Tr. 477, 508, 511, 514, 619)  On January 13, 2014, Lusher discharged himself from physical therapy because he was no longer experiencing symptoms from his fracture.  (Tr. 549)

On December 24, 2013 Lusher complained of low back pain. (Tr. 504) Robert Berkowitz, M.D. found Lusher's gait was normal, he could walk on heels and toes, and there was good strength, no swelling or step off, and no instability in Lusher's back. (Tr. 505) There was point tenderness across Lusher's lumbar spine and he had decreased range of motion in all directions, due to pain and body habitus. (*Id.*) Examination findings in the lower leg were normal. (*Id.*) X-rays of the lumbar spine showed diffuse degenerative changes throughout the lumbar spine and grade-1 degenerative spondylolisthesis at L4-L5. (*Id.*) Dr. Berkowitz diagnosed Lusher with degenerative spondylolisthesis at L4 on L5, some stenosis, and some weakness and a little bit of neurogenic claudication with walking and weakness in his legs. (Tr. 505-06) Dr. Berkowitz prescribed a lumbar brace and recommended physical therapy. (Tr. 506)

Between January 10 and January 31, 2014, Lusher received physical therapy from Katherine Long, PT to treat his lower back pain and degenerative lumbar disc. (Tr. 464-72, 550-52) Lusher reported pain in his lower back, hip, and lower extremities, and numbness in both lower extremities when "walking for a while." (Tr. 468, 470) He rated his pain at 2/10, 4/10, or 5/10 on a scale of 1 to 10. (Tr. 464, 466, 468, 536) Lusher reported he got low back stiffness and then numbness after "a couple minutes walking." (Tr. 470) Lusher reported his symptoms were relieved upon flexion, when sitting, and with the use of ibuprofen. (Tr. 471) Ms. Long found Lusher's range of motion, strength, sleep, and activities of daily living were painful and limited, his gait and core stabilization were limited, and his condition was worsening. (Tr. 471) He reported decreased pain and increased flexibility at the end of the treatment session. (Tr. 466, 468, 471, 536) On January 23, 2014, he declined lumbar manipulation because he felt his lumbar rotation was improved and reported increased relief of tightness. (Tr. 464)

On February 4, 2014, Lusher reported low back pain after his physical therapy and leg pain. (Tr. 502) He reported that the physical therapy helped with the tightness of his low back

but not with the pain.  (*Id.*)  On examination, Dr. Berkowitz found Lusher's back was tender and had decreased range of motion, but there was good strength and no instability.  (Tr. 503)  He found no point tenderness, swelling, or deformity, full range of motion of the hips, knees, and ankles, and strength 5/5 throughout.  (*Id.*)  Dr. Berkowitz found Lusher responded somewhat to physical therapy, "loosened up a little bit," and had spondylolisthesis at L4 and L5.  (Tr. 503)  Dr. Berkowitz ordered an MRI of Lusher's lumbar spine.  (Tr. 503)  The MRI showed that there was no fracture or other acute findings, and degenerative changes were most pronounced at L4-5 and L5-S1 where there were mild bilateral neural foraminal stenoses and mild canal stenoses.  (Tr. 474-75, 483, 754)

On February 18, 2014, Lusher reported he had back and leg pain.  (Tr. 500)  Although his tightness had improved, he still had some back pain.  (*Id.*)  He reported that when he walked his legs would get heavy and he would be achy, and sore in his buttocks and hamstrings.  (*Id.*)  He reported that physical therapy did not improve the symptoms.  (Tr. 500)  On examination, the findings regarding Lusher's legs were normal, but there was tenderness in Lusher's lumbar spine, good back range of motion, and good strength.  (Tr. 501)  Dr. Berkowitz found the MRI showed at L4-5 moderate central stenosis, some mild bilateral foraminal stenosis, and grade 1 spondylolisthesis, but no stenosis at L5-S1.  (*Id.*)  Dr. Berkowitz stated that Lusher's options were to continue therapy or try epidural injections or surgery.  (*Id.*)

On March 6, 2014, Lusher underwent physical therapy and rated his pain at zero out of ten.  (Tr. 518)  He reported increased strength, flexibility, and tissue mobility after the treatment session.  (*Id.*)

On March 12, 2014, Dr. Berkowitz administered a lumbar interlaminar epidural steroid injection to treat Lusher's lumbar stenosis.  (Tr. 483)  Dr. Berkowitz noted that Lusher's bilateral extremities had good range of motion and were nontender.  (*Id.*)  In a follow-up appointment on

April 1, 2014, Lusher reported that the injection helped very little and only gave him ten percent relief. (Tr. 498) Lusher reported some back pain and heaviness and numbness in his legs when he walked and moved around. (*Id.*) Dr. Berkowitz noted no evidence of any weakness other than the spondylolisthesis and spinal stenosis at L4-L5. (*Id.*) On examination Lusher's back was tender and had decreased range of motion, but his lower extremities had no tenderness, swelling, or deformity and normal strength and range of motion. (*Id.*)

On March 27, 2014 Lusher reported symptoms of depression to Dr. Pedro, including anhedonia, depressed mood, difficulty concentrating, fatigue, hopelessness, and insomnia, and symptoms of anxiety, including irritability and racing thoughts. (Tr. 652) Lusher stopped taking Wellbutrin because "he could not tolerate" it and resumed taking Cymbalta. (*Id.*)

On April 11, 2014, Lusher saw Maher S. Kodsy, M.D. for pain management treatment. (Tr. 610-12) Lusher said he was experiencing constant, throbbing, moderate pain in the area of his lumbar spine which he rated as a 6 on a scale of 1 to 10. (Tr. 610) He stated walking and standing exacerbated his back pain. (*Id.*) Dr. Kodsy found normal range of motion and no areas of tenderness in Lusher's shoulders. (Tr. 611) Lusher had pain with lateral flexion bilaterally and facet tenderness bilaterally over the L4-L5 and L5-S1. (*Id.*) Range of motion in the hips was normal bilaterally. (*Id.*) Strength, sensation, and reflexes of the upper and lower extremities were within normal limits bilaterally. (Tr. 611) Dr. Kodsy diagnosed Lusher with benign essential hypertension, lumbar nerve root compression, and unspecified backache, degeneration of lumbar or lumbosacral intervertebral disc, lumbar disc displacement/herniation, and spondylosis with myelopathy in the lumbar region. (Tr. 612) Dr. Kodsy recommended facet block with Mobic. (*Id.*)

On April 29, 2014, Lusher requested discharge from physical therapy because he preferred pain management therapy. (Tr. 517) On

Between June 26, 2012 and September 17, 2014, Dr. Pedro treated Lusher for several conditions, including: pruritic rash, sore throat, having staples removed after he cut the top of his scalp jumping into a pool, hypertension, and hyperlipidemia. (Tr. 641-642, 647, 659) Dr. Pedro advised exercise and diet changes. (Tr. 646, 658, 663) On February 13, 2014, Lusher reported gradually worsening symptoms of depression, including anhedonia, depressed mood, difficulty concentrating, fatigue, feelings of worthlessness/guilt, hopelessness, hypersomnia, and weight gain, and anxiety, including dizziness, feelings of losing control, irritability, panic attacks, psychomotor agitation, racing thoughts, and shortness of breath. (Tr. 650) He reported he wanted to change medications from Cymbalta, due to weight gain. (Tr. 650) Dr. Pedro agreed and prescribed Xanax and Wellbutrin. (Tr. 651)

On March 27, 2014, Lusher reported he discontinued Wellbutrin, because he could not tolerate it, and he resumed taking Cymbalta. (Tr. 652) He reported depression symptoms, including anhedonia, depressed mood, difficulty concentrating, fatigue, hopelessness, and insomnia; and anxiety symptoms, including irritability and racing thoughts. (Tr. 652) Dr. Pedro found Lusher appeared well, in no apparent distress, alert and oriented, and pleasant and cooperative. (Tr. 650) Other than weight gain, Lusher reported no side effects from his medication; and, at several appointments, he said he'd had no headaches or symptoms of anxiety, depression, memory or concentration difficulties, or sleep disturbances. (Tr. 644, 646, 647, 656, 659, 660)

On August 4, 2014, Lusher established care with Todd S. Hochman, M.D. (Tr. 619) Lusher reported left leg pain and back pain associated with paresthesias in the lower extremities. (*Id.*) On examination, Lusher had some midline discomfort in the lumbar region and mild discomfort over the left lower extremity. (Tr. 620) He also complained of pain into the hips and lower extremities and paresthesias, proximal to the knee. (*Id.*) Lusher had increased pain with

lumbar extension and relief with lumbar flexion.  (*Id.*)  In a follow-up exam on September 20, 2014, Dr. Hochman found minimal discomfort in Lusher's leg, midline discomfort in the lumbar region with some tightness, and some pain with "SLR."  (Tr. 618)  On January 28, 2015 Dr. Hochman noted that Lusher ambulated with an antalgic gait and was having problems throughout the back and hip.  (Tr. 617)  On examination, Lusher had some midline discomfort and trigger point discomfort to the right of the midline, pain in the lower left extremity with "SLR," tenderness over the inguinal region that increased with rotational components throughout the hip, and an antalgic gait.  (*Id.*)

On December 22, 2014, an outpatient service provider discussed diet and exercise changes with Lusher to improve his health.  (Tr. 678)  Service providers continued to recommend weight loss.  (Tr. 690-91, 695, 819)  Lusher reported no psychological or musculoskeletal symptoms.  (Tr. 675)

On June 29, 2015, Lusher saw Dr. Pedro for his annual examination, flu, hyperlipidemia, and "labs."  (Tr. 711)  Six months had elapsed since the time Dr. Pedro had last seen Lusher.  (*Id.*)  Lusher reported that he was feeling well and denied any side-effects from his medications.  (Tr. 711)  Lusher did not report any psychological or musculoskeletal symptoms.  (Tr. 712-13)  Dr. Pedro discussed Lusher's diet and exercise needs.  (Tr. 714)  Dr. Pedro instructed Lusher to return in about six months.  (*Id.*)

On July 10, 2015, Lusher saw Dr. Sese, after not having seen him for almost three years.  (Tr. 699)  Lusher complained of frequent headaches.  (Tr. 699)  Dr. Sese increased Lusher's Neurontin dose.  (*Id.*)  Lusher also complained of having had muscle twitching, but no associated muscle pain, for the past 8-10 months.  (*Id.*)  Dr. Sese noted that Lusher's shoulder shrug strength was good and that he moved his extremities spontaneously with no focal motor weakness.  (*Id.*)  Lusher's muscle tone was normal, his tendon reflexes were symmetrical, and

his gait was steady.  (*Id.*)  On September 16, 2015, Lusher told Dr. Sese the added Neurontin was helping his headaches.  (Tr. 703)  An electromyography showed probable cervical radiculopathy that might have been causing the fasciculations.  (Tr. 703)  Dr. Sese saw no symptoms or motor neuron disease.  (*Id.*)  An x-ray of Lusher's cervical spine showed mild multilevel degenerative changes, which were greatest from C4-5 through C6-7.  (Tr. 707)

On October 22, 2015, Lusher saw Dr. Pedro regarding his chronic medical conditions and "to have his disability paperwork completed."  (Tr. 805)  Lusher reported psychological symptoms, including anxiety, concentration difficulties, depression, irritability, memory difficulties, and sleep disturbances.  (Tr. 807)  He also reported musculoskeletal symptoms, including gait disturbance, joint stiffness, joint swelling, muscle pain, muscular weakness, and pain in the upper and lower back and bilateral arms, hands, hips, knees, and shoulders.  (Tr. 807)  Lusher was negative for headaches.  (*Id.*)  A shoulder examination showed positive impingement signs with pain at the high arc of abduction and forward flexion on both sides.  (*Id.*)  Dr. Pedro diagnosed muscle twitching, weakness to both upper and lower extremities, lumbar radiculopathy, rotator cuff syndrome of both shoulders, and coronary artery disease.  (Tr. 807-08)  Dr. Pedro recommended that Lusher treat his shoulder with alternate application of heat and ice, followed by passive range of motion exercises, analgesics, muscle relaxants, and a home back-care exercise program.  (Tr. 808)

On October 28, 2015, Lusher had a follow-up appointment with Dr. Sese regarding his migraines.  (Tr. 749)  Lusher reported that Neurontin "continue[d] to help."  (Tr. 749)  Dr. Sese found that Lusher's memory, attention span, and concentration were normal.  (Tr. 749)  Dr. Sese found Lusher moved all four extremities spontaneously, with no focal motor weakness or pronator drift, his muscle tone was normal, and his reflexes were symmetrical.  (*Id.*)  A MRI of Lusher's cervical spine showed mild to moderate annular bulging at the C4-5, C5-6, and C6-7,

degrees of foraminal narrowing, and mild to moderate central stenosis at C4-5 and C5-6.  (Tr. 791)

On January 6, 2016, Lusher saw Dr. Sese regarding his migraines and radiculopathy.  (Tr. 786)  He noted that a MRI of Lusher's spine showed mild to moderate cervical stenosis, but that Lusher was not a candidate for surgery.  (*Id.*)  The musculoskeletal findings were normal and Lusher's gait was steady, shoulder shrug strength was good, reflexes were symmetrical, and Lusher was able to spontaneously move all four extremities with no focal motor weakness.  (*Id.*)  Lusher said that gabapentin continued to help.  (Tr. 786)  Dr. Sese recommended that Lusher aim for a healthy weight and maintain healthy lifestyle habits.  (Tr. 787)

On January 11, 2016, Lusher had a six-month follow-up with Dr. Pedro and reported that he was feeling well and denied any side effects from his medications.  (Tr. 796)  Lusher reported he had no psychological symptoms.  (Tr. 797)  He reported joint pain, joint stiffness, pain in the lower back, and recurrent muscle twitching.  (*Id.*)  On examination, Dr. Pedro found no joint tenderness, deformity, or swelling and no neurological focal findings or movement disorder.  (Tr. 798)  Dr. Pedro discussed the appropriate diet and recommended a regular exercise program to help achieve and maintain normal body weight, fitness, and improve lipid balance.  (Tr. 800-01)

### C.    Opinion Evidence

#### 1.    Thomas M. Evans, Ph.D. – State Agency Examining Psychologist

On November 13, 2014, state agency psychologist, Thomas M. Evans, Ph.D., examined Lusher, finding him cooperative and friendly throughout the entire evaluation.  (Tr. 670)  Lusher stated his "back [wa]s the main thing" causing his disability.  (Tr. 671)

Dr. Evans diagnosed Lusher with persistent depressive disorder, moderate with anxious distress (mild).  (Tr. 673)  He opined that Lusher's cognitive abilities were in the average range.  (*Id.*)  He found Lusher was able to maintain focus without any difficulties and displayed good

attention and concentration throughout the evaluation.  (*Id.*)  Lusher did not display any psychomotor agitation or restlessness.  (*Id.*)  Lusher reported having always gotten along with supervisors and coworkers and having had no problems taking directives from authority figures.  (*Id.*)  Dr. Evans opined that Lusher's mood and anxiety symptoms did not appear to prohibit employment, in and of themselves.  (Tr. 674)

### 2.    William O. Boyce, M.D. – State Agency Examining Physician

On March 14, 2015, state agency examining physician, William O. Boyce, M.D., examined Lusher regarding his low back pain.  (Tr. 680)  Dr. Boyce noted decreased range of motion in Lusher's left shoulder, which could not be elevated more than 90 degrees.  (Tr. 681-82)  A supraspinatus test was abnormal.  (Tr. 681.)  Otherwise, Lusher's range of motion was normal throughout.  (*Id.*)  There was mild tenderness to palpation over the low back and right hip.  (*Id.*)  There was normal strength in the upper and lower extremities bilaterally, other than slight decreased strength in the right shoulder.  (*Id.*)  A straight leg raise was positive on the right, and caused shooting pain down the back of the right leg to the knee.  (Tr. 681-82)  Reflexes were +2 in the bilateral upper and lower extremities.  (Tr. 681)  Lusher's gait was normal.  (*Id.*)  Dr. Boyce examined x-rays of Lusher's right hip and found no acute fracture or dislocation, preserved joint spaces, and the soft tissues appeared unremarkable.  (Tr. 682)  There was mild arthrosis of the right sacroiliac joint and mild multilevel degenerative changes in the low lumbar spine.  (*Id.*)  Dr. Boyce concluded that the joint space in the right hip was preserved, revealing no acute osseous abnormality.  (*Id.*)  Dr. Boyce stated his findings were compatible with degenerative disk disease in the lumbar spine with suggested nerve impingement.  (*Id.*)  He stated that Lusher had limited function in his left shoulder due to chronic rotator cuff disease bilaterally, despite surgical repair of the right shoulder.  (Tr. 682)  Dr. Boyce adopted Lusher's statements that he could sit comfortably, stand, or walk for a maximum of 20 minutes (Tr. 680-

682); and he adopted Lusher's report that he could lift over 50 pounds, but could not do so above his head due to his left shoulder limitations. (*Id.*) Dr. Boyce opined that Lusher's push and pull movements, fine motor skills, and manual dexterity in his hands were preserved. (Tr. 682)

### 3. Abraham Pedro, M.D. – Treating Physician

On October 22, 2015, Abraham Pedro, M.D. issued a medical statement assessing Lusher's physical abilities and limitations (Tr. 719) and responded to an off-task/absenteeism questionnaire. (Tr. 722) In the medical statement, Dr. Pedro diagnosed Lusher with weakness in his upper and lower extremities, lumbar radiculopathy, chronic lower back pain, muscle twitching, and rotator cuff syndrome. (Tr. 719) Dr. Pedro opined that Lusher could stand or sit for fifteen minutes at one time, stand or sit for two hours in a workday, and lift 10 pounds frequently and twenty pounds occasionally. (*Id.*) He opined Lusher could: occasionally bend, stoop, balance, do fine manipulation of the right or left hand, operate a motor vehicle, or tolerate heat, cold, dust, smoke, fumes exposure, or noise exposure; and never raise his right or left arm over shoulder level, work around dangerous equipment, or tolerate heights. (*Id.*) He also opined that Lusher could both frequently and never do gross manipulation with his left hand. (*Id.*) He opined that Lusher had limited distance vision and hearing and occasionally needed to elevate his legs above his waist in an eight-hour workday. (*Id.*) He opined Lusher suffered from severe pain and would be absent from work due to his impairments or for treatment more than three times a month. (*Id.*)

In the off-task, absenteeism questionnaire, Dr. Pedro opined that Lusher would likely be off task 20% of the time, exclusive of a lunch break and two fifteen minute breaks, and would be absent from work more than four times a month. (Tr. 722) He opined that Lusher would be off-task due to the following underlying mental or physical impairments: weakness in his upper and lower extremities, lumbar radiculopathy, chronic lower back pain, muscle twitching, and rotator

cuff syndrome.  (*Id.*)  He opined that Lusher would have an inability to concentrate, pay attention, and/or focus on a sustained basis due anxiety disorder.  (*Id.*)  He opined that Lusher experienced drowsiness and/or need to lie down and rest or sleep because of sleep apnea.  (*Id.*)  He opined that Lusher experienced side effects from medications, including drowsiness and fatigue.  (*Id.*)  He opined that Lusher experienced "severe pain with walking and prolonged standing," but he did not fill out the portion of the form that sought information regarding the location of the pain.  (*Id.*)

### 4.    Norman T. Sese, M.D. – Treating Physician

Norman T. Sese, M.D. evaluated the impact of headaches on Lusher's RFC on October 28, 2015.  (Tr. 725-27)  Dr. Sese noted that he had contact with Lusher since 2012.  (Tr. 725)  He stated that Lusher's prognosis regarding his migraine condition was good.  (*Id.*)  Dr. Sese indicated that Lusher had migraine headaches that were associated with symptoms of nausea/vomiting and photosensitivity.  (*Id.*)  Dr. Sese stated that Lusher experienced headaches five times a month for 1.5 hours.  (*Id.*)  He noted that bright lights made Lusher's headaches worse and being in a dark room or quiet place made the headaches improve.  (*Id.*)  Dr. Sese did not fill out the part of the form that sought information regarding positive test results or objective signs of the patient's headaches.  (Tr. 11)  Dr. Sese opined that Lusher's headaches could be caused by anxiety and tension.  (Tr. 726)  He indicated emotional factors somewhat contributed to the severity of Lusher's headaches.  (*Id.*)  Dr. Sese indicated that Lusher's impairments would last at least twelve months and that Lusher was generally precluded from performing even basic work activities when he had a headache.  (*Id.*)  He indicated that Lusher would need unscheduled breaks during a workday, but that he could not determine the frequency or duration of those breaks.  (*Id.*)  Dr. Sese indicated that Lusher could tolerate moderate stress, would have "good

days" and "bad days," and would likely be absent about three days a month due to his impairments or treatments.  (Tr. 726)

### 5.      Leon D. Hughes, M.D. – State Agency Medical Consultant

On November 17, 2014, state agency medical consultant Leon D. Hughes, M.D. opined on Lusher's physical RFC.  (Tr. 160-70)  Dr. Hughes stated Lusher: could lift and/or carry twenty pounds occasionally and ten pounds frequently; could sit, stand, and/or walk about six hours in an eight-hour workday; and had an unlimited capacity to push and/or pull, other than the limitations on his ability to lift and carry.  (Tr. 169)  He opined Lusher could occasionally stoop, crouch, or climb ladders, ropes, or scaffolds.  (*Id.*)  He opined Lusher had no manipulative, visual, communicative, or environmental limitations.  (Tr. 170)

### 6.      Diane Manos, M.D. – State Agency Medical Consultant

On March 26, 2015, state agency medical consultant Diane Manos, M.D. also opined on Lusher's physical RFC.  (Tr. 187-88)  Dr. Manos stated Lusher: could lift and/or carry twenty pounds occasionally and ten pounds frequently; sit, stand, and/or walk six hours in an eight-hour workday; and had a capacity to push and/or pull that was limited only by his ability to lift and carry.  (Tr. 187)  Dr. Manos opined Lusher could never climb ladders, ropes, or scaffolds, but could occasionally engage in climbing ramps and stairs, stooping, kneeling, crouching, or crawling.  (*Id.*)  She opined Lusher was limited in his ability to reach overhead, in front, or laterally on his left, due to his left upper extremity pain and shoulder problem.  (Tr. 188)  She opined Lusher had no other manipulative limitations and no visual, communicative, or environmental limitations.  (*Id.*)

### D.  Hearing Testimony

#### 1.  Claimant's Hearing Testimony

On April 27, 2016, Lusher testified that he lived with his wife and youngest daughter. (Tr. 121)  Lusher stated he had completed two years of college.  (Tr. 123)

Lusher stated he continuously worked as an ironworker for approximately 26 or 27 years. (Tr. 123-24)  He stated there may have been other work he was capable of doing, but, physically and emotionally, it would be "a very tough situation" to go somewhere where he was no longer in a union and unable to have his rights as a worker.  (Tr. 142-43)  He stated that "taking a pay cut from $30 an hour . . . just wasn't going to, wasn't going to get it. . . ."  (Tr. 143)

Lusher stated he last worked in 2013.  (Tr. 123)  He testified that he could no longer work because he "beat [him]self up physically and emotionally," worked in all kinds of weather, and the job was physical, psychologically stressful, and dangerous.  (Tr. 124)  He stated he could not work due to back issues, his shoulders, his hands, "the neuropathy," vertigo, and "the carpal tunnel."  (Tr. 125)  He stated he was only able to work or sit for "certain periods of time" or walk "certain distances" before he had to get up or sit down and "it would be a struggle to try to do other things."  (Tr. 125)  He stated he could lift 25 pounds at most and it was a struggle to carry something in front of himself, like a laundry basket, because it would put strain on his lower back and cause pain to radiate into his hips.  (Tr. 127)  He rated his daily pain as six to nine on a ten scale.  (Tr. 126)  He stated he could only stand fifteen minutes at a time, or a total of two hours in an eight-hour workday.  (Tr. 126-27)  He stated that he feared for his personal safety because of his vertigo and inability to grip things well.  (Tr. 126)  He stated he had a problem with his left shoulder that required surgery, which he "put off and put off."  (Tr. 128)  He reported "unbearable" back pain, stiffness in his neck, constant pain in his leg, tingling in his hands and feet, left leg, and right arm.  (Tr. 128)  He also reported twitching in his jaw and arms,

the left arm primarily; he felt his sleep apnea caused these conditions.  (Tr. 129)  He stated he had trigger finger, which was a symptom of his carpal tunnel syndrome.  (Tr. 129)

When asked whether he had the ability to do other less demanding jobs, Lusher stated he felt he was limited because he had worked as an ironworker for so many years.  (Tr. 125)  He stated he was "basically in constant pain because of the back," but only took over-the-counter medications, which "just kind of takes the edge off of things."  (*Id*.)  He stated he did not take prescription painkillers, because his sister died from drug abuse.  (Tr. 125)

Lusher received workers' compensation benefits after suffering a broken leg at work. (Tr. 123)  He stated that since he stopped working he gained weight due to physical inactivity. (Tr. 131)  He stated he took antidepressants, which made weight loss difficult.  (*Id.*)

Lusher stated he had two dogs that he took care of on a daily basis.  (Tr. 121-22)  He stated he had a driver's license and drove to the hearing.  (Tr. 122)  He stated that on a typical day, he would let the dogs out, make a pot of coffee, sit down, do stretching exercises, watch television, vacuum or make beds, cook dinner, talk at the dinner table, and then go to bed.  (Tr. 129, 130)  He stated he would vacuum once a week and did yardwork and used a riding lawn mower.  (Tr. 130, 133)  He stated he physically could not walk his dogs anymore.  (Tr. 132)

Lusher stated his left hand and fingers twitched.  (Tr. 137)  He stated he had not obtained treatment for his left shoulder yet because of issues with his insurance.  (Tr. 138)

Lusher stated he had been having migraine headaches since about 2010.  (Tr. 139)  He stated he took 600 mg of Neurontin daily, which helped to "take the edge off the migraines." (Tr. 140)  He stated the weather could exacerbate his symptoms and that he had a hypersensitivity to light and sound.  (*Id.*)

Lusher stated he experienced lower back pain that consisted of constant tightness and throbbing. (*Id.*) He stated he experienced neck pain when he moved or turned his head. (*Id.*) He said he would sometimes get "a stiff neck." (*Id.*)

Lusher stated he obtained Cymbalta from Dr. Sese and had undergone counselling for a seven month period. (Tr. 140-41) He stated he became depressed when he was no longer able to do the work he had done for many years. (Tr. 141)

## 2. Vocational Expert Testimony

Vocational expert Paula Zinsmeister characterized Lusher's past work history as that of an iron worker, with a performed physical demand level of heavy to very heavy. (Tr. 144) Because Lusher raises no issue respecting the content of the hypothetical questions posed to the VE or concerning the VE's opinions in response to those questions, it is unnecessary to summarize the VE's testimony. The VE identified light work jobs in substantial numbers that a hypothetical person with Lusher's RFC could perform. The VE also testified that it would be work preclusive for an employee to be off task more than 15 percent of the time. (Tr. 153) The VE stated that if the hypothetical person were absent three or more days per month, they would not be able to perform any of the identified jobs. (*Id.*)

## IV. ALJ's Findings and Decision

The ALJ's May 31, 2016 decision contained the following paraphrased findings relevant to this appeal:

3. Lusher had the following severe impairments: degenerative disc disease, obesity, coronary artery disease, dysfunction of a major joint, and vertigo (20 C.F.R. 404.1520(c)). (Tr. 14);

5. After careful consideration of the entire record, the ALJ found that Lusher has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except Lusher can frequently use hand controls bilaterally. He can occasionally reach overhead with his left arm. He can frequently reach in all other directions with his left arm. He can handle frequently bilaterally. He can

occasionally climb ramps and stairs.  He can never climb ladders, ropes, or scaffolds.  He can occasionally stoop, kneel, crouch, and crawl.  He can never be exposed to unprotected heights or moving mechanical parts.  He can never engage in commercial d1iving.  He will be off task less than 10% of the time in an eight-hour workday.  (Tr. 19-24);

6.  Lusher was unable to perform any past relevant work (20 C.F.R. 404.1565).  (Tr. 24);

10.  Considering Lusher's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Lusher can perform (20 C.F.R. 404.1569 and 404.1569(a)).  (*Id.*)

Based on his eleven findings, the ALJ determined that Lusher was not disabled at any time from December 13, 2013, through the date of the decision, May 31, 2016.  (Tr. 26)

## V.  Law and Analysis

### A.  Standard of Review and Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy1....

42 U.S.C. § 423(d)(2)(A).

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow the five-step sequential analysis set out in agency regulations, which can be paraphrased

as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's RFC and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and RFC, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

at Step Five to produce evidence that establishes whether the claimant has the RFC and

vocational factors to perform other work available in the national economy. *Id.*

This court's review is limited to determining whether there is substantial evidence in the

record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed

if the administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been

defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999); *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984)).

The court must also determine whether proper legal standards were applied, because, if not, reversal is required, unless the error of law was harmless. *See, e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was

discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

## A. Treating Source Rule

Lusher argues the ALJ erred by improperly analyzing the opinions of treating physician Abraham Pedro, M.D. *See* ECF Doc. 12, Page ID# 895. As described above, Dr. Pedro prepared two opinions regarding Lusher's RFC: (1) a medical statement regarding Lusher's physical abilities and limitations ("medical statement"); and (2) an off-task/absenteeism questionnaire ("off-task questionnaire"). (Tr. 719, 722) Because Lusher raises several arguments concerning the errors the ALJ allegedly made with respect to these two opinions, each opinion will be addressed, and discuss Lusher's arguments will be considered in a different order than they were set forth in his brief.

### 1. Dr. Pedro's Medical Statement

The ALJ weighed Dr. Pedro's medical statement as follows:

Dr. Pedro opined that the claimant was able to stand for up to two hours during a workday and sit for sit hours during a workday. He was able to lift up to 20 pounds occasionally and 10 pounds frequently. He could occasionally bend, stoop, balance, and perform fine manipulation. He could frequently perform gross manipulation with the right hand. Dr. Pedro circled responses indicating the claimant could never perform gross manipulation with the left hand and that the claimant could do this frequently. He could never raise his arms above shoulder level. He could occasionally operate a motor vehicle. He could occasionally tolerate heat, cold, respiratory irritants, and noise. He could never tolerate heights. He had limited distance vision and hearing. He would need to elevate his legs occasionally during the workday. He would miss work more than three times a month (Exhibit 25F, page 3). I give this opinion little weight. While Dr. Pedro is a treating source, his opinion is not consistent with the evidence of record. The record does not indicate that the claimant has any limitations in sitting; restrictions from temperature, respiratory irritants, or noise; or a need to elevate his legs during the workday. Dr. Pedro did not explain why the claimant would miss work more than three times a month. Dr. Pedro's opinion is not

supported by his treatment notes, which do not indicate significant physical limitations (Exhibit 36F, page 4).  His opinion is not consistent with the record as a whole (see Exhibit 20F; Exhibit 22F, page 3).

(Tr. 22-23)

Dr. Pedro was undisputedly Lusher's treating physician.  (Tr. 17)  Evidence from doctors who treat Social Security applicants must be weighed using specific requirements created by the federal government.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  The ALJ must examine what work the treating source performed.  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record."  *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

The ALJ gave Dr. Pedro's medical statement only little weight.  (Tr. 23)  When an ALJ does not give the treating source opinion controlling weight, the ALJ must use several factors to determine the weight to give the opinion, including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or contradict the opinion.  20 C.F.R. § 416.927(c).  The term "not inconsistent" is "used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence . . . as long as there is no other substantial evidence in the case record that contradicts of conflicts with the opinion."  SSR 96-2p.  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion.  20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2); *see also Cole*, 661 F.3d at 938.  The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that weight."
*Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996
WL 374188, at *5 (Soc. Sec. Admin., July 2, 1996)). However, the ALJ is not obligated to
provide an "exhaustive factor-by-factor analysis." *See Francis v. Comm'r of Soc. Sec.* 414 Fed.
App'x. 802, 804 (6th Cir. 2011).

**a.     The ALJ provided good reasons for giving little
weight to Dr. Pedro's medical statement**

Lusher argues the ALJ failed to evaluate Dr. Pedro's statement under the § 404.1527(c)
factors. *See* ECF Doc. 12, Page ID# 900. By noting that Dr. Pedro was Lusher's primary care
physician, the ALJ discussed the nature of the treating relationship and encapsulated all of the
evidence regarding Dr. Pedro's specialization present in the administrative record. (Tr. 16, 17)
The ALJ did not discuss the frequency or length of the treatment relationship, which began in
2010. (Tr. 408-26) As a general rule, the longer a treating source has treated a claimant and the
more often the claimant has been seen by the treating source, the more weight the treating
source's opinions is given. 20 C.F.R. §§ 404.1527(i)(ii), 416.927(i)(ii). Lusher argues the ALJ
did not state he'd considered the fact that Dr. Pedro actually examined Lusher on multiple
occasions. *See* ECF Doc. 12, Page ID# 901). This argument lacks merit. The ALJ's
acknowledgement that Dr. Pedro was a treating source (Tr. 23), his finding that Dr. Pedro's
opinion was not supported by his treatment notes, and the ALJ's citation of treatment notes
demonstrate that the ALJ considered that Dr. Pedro was a treating physician who actually
examined Lusher. (Tr. 20, 22-23 (citing 713, 794, 798, 807))

Although the ALJ did not explicitly address certain of the § 404.1527(c) factors, he was
not required to do so; and the ALJ did provide "good reasons" for assigning little weight to Dr.
Pedro's medical statement. *See* 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) (The ALJ is not

required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion.); *see also Cole*, 661 F.3d at 938.  The ALJ found that Dr. Pedro's medical statement was not consistent with the evidence of record, as a whole.  (Tr. 23)  He found that Dr. Pedro's opinion that Lusher would miss work more than three times a month was not supported by an explanation.  (*Id.*)  The ALJ also found Dr. Pedro's treatment notes did not support his opinion, because the notes did not indicate significant physical limitations.  (*Id.*)  The ALJ noted that Lusher didn't complain about his allegedly disabling symptoms on several of the occasions he saw Dr. Pedro.  (Tr. 17, 639-40, 643-45, 647-49, 650, 652-53)

Dr. Pedro's opinions, and the symptoms Lusher reported to Dr. Pedro on the date he requested Dr. Lusher fill out his disability paperwork, are anomalous compared to the rest of the medical records from around that time period.  The ALJ noted that after March 14, 2015, Lusher's musculoskeletal evaluations were generally unremarkable.  (Tr. 21)  On December 22, 2014, Lusher reported having no anxiety, depression, musculoskeletal pain or weakness, headaches, gait disturbance, numbness/tingling, or tremors.  (Tr. 675)  A medical examination revealed only normal findings.  (Tr. 675-76)  Six months later, on June 29, 2015, Lusher again reported having no symptoms, and Dr. Pedro, noting only normal findings, ordered Lusher to return in six months.  (Tr. 21, 712-13)  On July 10, 2015, Dr. Sese found Lusher had good shoulder shrug strength, moved his extremities with no focal motor weakness; and had normal muscle tone, a steady gait, and symmetrical deep reflexes.  (Tr. 699)  Then, on October 22, 2015 – the date Lusher gave Dr. Pedro his disability paperwork – Lusher reported a host of problems: anxiety, concentration difficulties, depression, irritability, memory difficulties, sleep disturbances, gait disturbance, joint stiffness, joint swelling, muscle pain, muscular weakness, and pain in his arms, upper and lower back, hands, hips, knees, and shoulders.  (Tr. 805, 807)

On examination, Dr. Pedro found Lusher's shoulder showed positive impingement signs with pain at the high arc of abduction and forward flexion on both sides and tenderness in the glenohumeral joint. (Tr. 807)

Two and a half months later, on January 11, 2016, Lusher only reported symptoms of joint pain, joint stiffness, pain in the lower back, and muscle twitching; and, on examination, Dr. Pedro found no joint tenderness, deformity, or swelling. (Tr. 797-98)

The commissioner argues that the record evinces only mild to moderate impairments. ECF Doc. 13, Page ID# 920 (citing Tr. 474-75, 707, 787). An MRI of Lusher's lumbar spine on February 14, 2014, showed only "mild" degenerative changes at the L4-5 and L5-S1, including "mild bilateral neural foraminal stenoses and mild canal stenoses." (Tr. 474-75, 754) Dr. Berkowitz examined the MRI and noted "moderate central stenosis and some mild bilateral foraminal stenosis and a grade 1 spondylolisthesis" at the L4-L5, "some mild congenital stenosis, but nothing significant," and no stenosis at L5-S1. (Tr. 501) An x-ray of Lusher's cervical spine performed on September 23, 2015 showed "mild multilevel degenerative change, greatest from C4-5 through C6-7." (Tr. 707) A November 11, 2015 MRI of Lusher's cervical spine showed multilevel degenerative changes, including mild to moderate annular bulging at C4-5, C5-6, and C6-7 and a mild to moderate degree of central stenosis at C4-5 and C5-6. (Tr. 790-91) In January 2015, Dr. Sese reviewed the MRI and found Lusher was not a candidate for surgery. (Tr. 786)

The commissioner argues that "[d]espite reported 'intolerable' pain, [Lusher] maintained good range of motion and strength and managed to complete relatively normal daily activities. *See* ECF Doc. 13, Page ID# 921 (citing 501, 503, 681, 684-86). The ALJ noted Lusher's testimony that on a daily basis would let his dogs out, make coffee, do stretching exercises, vacuum or make beds, and cook dinner. (Tr. 20, 130) The ALJ noted that Lusher did yard work

and used a riding lawn mower.  (Tr. 20, 130)  The ALJ noted that Lusher continued to drive a car.  (Tr. 19, 122)  Lusher counters that he complained of increased pain after shoveling snow. ECF Doc. 12, Page ID# 904 (citing Tr. 522, 524).  Lusher also discounts the commissioner's argument by citing 20 C.F.R. § 404.1572(c): "'generally, we do not consider activities [or] hobbies' to be indicative of the ability to work on a regular and continuing basis."  *See* ECF Doc. 14, Page ID# 940(he also cites SSR 12-1p ("We generally do not consider activities such as self-care, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be SGA)).  However, the Sixth Circuit has upheld an ALJ's determination that a claimant's statements about his symptoms were not credible in light of the claimant's daily living activities (which contradicted claims of severe disability).  *See, e.g., Bowman v. Comm'r of Soc. Sec.*, 683 F. App'x 367, 376 (6th Cir. 2017); *see also Amir v. Comm'r of Soc. Sec.*, 705 F. App'x 443, 450 (6th Cir. 2017) ("evidence regarding Amir's daily activities was plausibly contradictory.  The ALJ's adverse inference was therefore justified under prevailing Sixth Circuit law").

The commissioner also argues that Lusher only received conservative treatments.  *See* ECF Doc. 13, Page ID# 920.  A "conservative treatment approach suggests the absence of a disabling condition."  *Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678 (6th Cir. 2013) (finding a "conservative treatment approach" when the claimant refused more aggressive treatment, forwent steroid injections and pain medication, and choose to rely on over-the counter medications); *see also Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1001 (6th Cir. 2011) (noting the ALJ found the treating physician's "modest treatment regimen for [the claimant]—consisting solely of pain medication—was inconsistent with a finding of total disability").  Dr. Berkowitz gave Lusher a lumbar epidural injection in March 2014, but Lusher reported it gave him "maybe 10% relief."  (Tr. 498)  Lusher only underwent two months of physical therapy for his degenerative lumbar disc and low back pain conditions before he

discharged himself and elected to undergo pain management treatment instead.  (Tr. 517)

Although the commissioner asserts that Lusher did not follow through on seeking pain

management treatment (ECF Doc. 13, Page ID# 920), the record shows that Dr. Kodsy, a pain

management practitioner, treated Lusher on April 11, 2014 and administered a lumbar facet

injection on May 29, 2014.  (Tr. 610-12, 613-16).  Dr. Kodsy also offered Lusher pain

medications, but Lusher opted to take over-the-counter medications instead, allegedly due to his

sister having been a drug addict.  (Tr. 20, 125, 162, 309)  Dr. Pedro noted positive impingement

signs and pain upon abduction and flexion in Lusher's shoulder and tenderness in his joints (Tr.

807), but only recommended Lusher apply heat for 10-15 minutes and do range of motion

exercises.  (Tr. 808)  The court finds that Lusher's conservative treatment approach, including

over-the-counter medications, epidural steroid injections, and failure to complete physical

therapy, provide substantial evidence supporting the ALJ's decision to give little weight to Dr.

Pedro's medical statement.  *C.f. Stankoski v. Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013)

(noting claimant did not feel her condition warranted a surgical procedure and opted for less

invasive epidural injections and pain management therapy); *Taylor v. Berryhill*, No. 2:16-CV-

1118, 2018 WL 947245, at *10 (S.D. Ohio Feb. 20, 2018) (finding the ALJ reasonably

considered plaintiff's conservative treatment consisting of nerve blocks and medications).

The court finds substantial evidence supports the ALJ's determination to give Dr. Pedro's

medical statement "little weight."  The limitations in Dr. Pedro's medical statement are

inconsistent with Dr. Pedro's treatment notes from the relevant period, Lusher's activities of

daily living, Lusher's "mild" to "moderate" objective test results, Lusher's conservative course

of treatment, and the record as a whole.

### b. The ALJ did not err in his analysis of the limitations in Dr. Pedro's medical statement

Lusher argues that "even if Dr. Pedro's opinions are only just *partially* credited, remand is the only appropriate remedy" because the RFC and hypotheticals posed to the vocational expert did not accurately set forth all the practical effects of all of Lusher's documented impairments. *See* ECF Doc. 12, Page ID# 897. This argument too lacks merit.

The ALJ explicitly addressed Dr. Pedro's opinions in the medical statement regarding Lusher's capacity to sit, and his restrictions from temperature, respiratory irritants, and noise, and his need to elevate his legs, as discussed in detail below. (Tr. 23) The ALJ found Dr. Pedro failed to provide an explanation supporting his opinion that Lusher would miss work more than three times a months, and the ALJ addressed Dr. Pedro's opinions regarding Lusher's absenteeism in the discussion of the off task/absenteeism opinion. (Tr. 17, 23) The ALJ also incorporated some of the limitations in Dr. Pedro's medical statement into the RFC, including Dr. Pedro's opinions that Lusher could: lift twenty pounds occasionally and ten pounds frequently, never tolerate heights or work around dangerous equipment; and occasionally operate a motor vehicle. (Tr. 19, 719)

Dr. Pedro opined that Lusher could only stand fifteen minutes at a time and two hours in a workday. (Tr. 22, 719) The ALJ did not explicitly address Lusher's capacity for standing. The ALJ did find, however, that Dr. Pedro's treatment notes did not indicate significant physical limitations, and the ALJ cited to part of an exhibit in which Dr. Pedro noted that he found no joint tenderness, deformity or swelling and no movement disorder. (Tr. 23, 798) The ALJ also cited portions of the record he found to be inconsistent with Dr. Pedro's opinion, including Dr. Boyce's opinion and Dr. Sese's treatment notes from July 10, 2015. (Tr. 23, 680-682, 699) Dr. Boyce found Lusher had: normal range of motion throughout, other than decreased range of

motion in the left shoulder; normal strength in the lower extremities bilaterally; and a normal gait. (Tr. 681) Dr. Boyce also found only mild degenerative changes in an x-ray of Lusher's lumbar spine and mild arthrosis in the right sacroiliac joint. (Tr. 682) Dr. Sese found that Lusher moved his extremities spontaneously with no focal motor weakness, his muscle tone was normal, deep tendon reflexes were symmetrical, gait was steady, and proprioception was intact. (Tr. 699) Other evidence in the record also supported the ALJ's decision, including the opinions of state agency reviewing physicians Dr. Hughes and Dr. Manos that Lusher could stand and/or walk for about six hours in an eight-hour workday. (Tr. 169, 187) The ALJ noted that Lusher: performed activities of daily living, including vacuuming, making bets, preparing dinner, and mowing the lawn with a riding lawn power (Tr. 20); was found to have range of motion, strength, sensation, and reflexes within normal limits in his lower extremities (Tr. 20, 21, 499, 501, 611); reported decreased pain in a physical therapy sessions (Tr. 20, 518); and did not report musculoskeletal symptoms to Dr. Pedro in the year before he asked Dr. Pedro fill out his disability forms. (Tr. 21, 712-13)

The ALJ noted that Dr. Pedro's opinion was internally inconsistent with respect to Lusher's manipulation abilities. (Tr. 22-23 ("Dr. Pedro circled responses indicating the claimant could never perform gross manipulation with the left hand and that the claimant could do this frequently."), 719) The ALJ also addressed Lusher's ability to perform fine and gross movements effectively and Lusher's shoulder impairments in his discussion of Listing 1.02. (Tr. 18)

The ALJ addressed Lusher's shoulder impairment in the RFC and stated that Lusher could "occasionally reach overhead with his left arm" and "could frequently reach in all other directions with his left arm." (Tr. 19) This RFC limitation was consistent with the opinion of state agency reviewing physician Dr. Manos. (Tr. 23, 188) The ALJ noted that some of Dr.

Pedro's medical statement limitations were not consistent with the evidence of record.  (Tr. 23)

The ALJ noted that the record did not contain findings on imaging studies of joint narrowing,

bony destruction, or ankyloses of Lusher's shoulder.  (Tr. 18)  Dr. Pedro noted few abnormalities

in Lusher's musculoskeletal system throughout his treatment (*see e.g.* Tr. 713), and Dr. Kodsy

and Dr. Berkowitz both found Lusher had a normal range of motion and no tenderness in his

shoulders and/or bilateral extremities.  (Tr. 21, 483, 611)  The ALJ noted that although Dr. Pedro

diagnosed Lusher with bilateral rotator cuff syndrome on the day Lusher gave Dr. Pedro his

disability paperwork, Dr. Pedro only recommended Lusher treat his condition by applying heat

and doing range of motion exercises.  (Tr. 21, 808)

     Lusher argues this case must be remanded because the RFC and the VE hypothetical

questions failed to include all of the practical effects of Lusher's documented impairments.  *See*

ECF Doc. 12, Page ID# 897.  It is the ALJ's responsibility to resolve the conflicts in the

evidence and incorporate only the credible limitations of record in the RFC finding.  *See* 20

C.F.R. § 416.946(c) (the final responsibility for assessing a claimant's RFC rests with the ALJ).

Because the ALJ found Dr. Pedro's assessment of certain of Lusher's impairments was not

credible, he was not required to incorporate those limitations into his RFC determination.  The

record also reflects that the hypothetical questions the ALJ posed to the VE were proper because

the ALJ incorporated all of the functional limitations that he deemed credible (Tr. 144-145).  *See*

*Masters v. Comm'r of Soc. Sec*., 707 F. App'x 374, 380 (6th Cir. 2017) ("While it is true that an

ALJ may rely on a VE's response to a hypothetical question only if the question accurately

portrays the claimant's impairments, the ALJ is required to incorporate only those limitations

that he or she accepted as credible."(internal quotation marks omitted)); *Casey v. Sec'y of Health*

*& Human Servs*., 987 F.2d 1230, 1235 (6th Cir.1993) ("It is well established that an ALJ may

pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.").

Lusher argues that there is evidence in the record, including his own testimony, supporting the limitations in Dr. Pedro's medical statement regarding Lusher's capacity for sitting, the need to elevate his legs, and the restrictions from temperature, respiratory irritants, and noise. *See* ECF Doc. 12, Page ID# 903. Lusher argues the sitting limitation, and leg elevation requirement, are supported by his testimony that he was "only able to work, or sit and walk certain distances and for certain periods of time before [he] ha[d] to get up or sit down . . . ." (Tr. 125), and his request for permission to "stand up for a little bit" during the hearing. (Tr. 126) Lusher argues that he complained of increased back pain due to prolonged sitting. *See* ECF Doc. 12, Page ID# 903 (citing Tr. 471, 680). But Lusher's characterization of the record disregards other occasions when he reported that his symptoms of back pain were "relieved upon flexion, when sitting, with use of over the counter medication and ibuprofen." (Tr. 471) Lusher reported to Dr. Boyce that he could only sit comfortably for a maximum of 20 minutes due to his pain, but he also claimed that his "pain [wa]s worsened with movement and walking," not sitting. (Tr. 680) Lusher further argues that he complained of leg pain and numbness. *See* ECF Doc. 12, Page ID# 903, 904 (citing Tr. 470, 498, 500, 504). But the record shows Lusher also reported that walking for a while, not sitting, caused the numbness in his legs. (Tr. 470, 498, 500, 528), *see also* ECF Doc. 12, Page ID# 904.

The ALJ found Lusher's testimony and statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 20) "'[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability.'" *Schmiedebusch v. Comm'r of Soc. Sec. Admin.*, 536 F. App'x 637,

649 (6th Cir. 2013) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 475–76). Courts "accord an ALJ's credibility determinations great weight and deference, and are limited to evaluating whether . . . the ALJ's explanations for partially discrediting [a claimant's testimony] are reasonable and supported by substantial evidence in the record." *Id.* (internal quotation marks omitted). The ALJ noted that although Lusher sometimes had tenderness in his lumbar spine, he also often had a good range of motion (Tr. 20, 501), good muscle strength (Tr. 20, 536, 498), and no joint instability. (499, 501, 503, 505) The ALJ noted that Lusher had degenerative disc disease, but his imagining studies had not demonstrated any spinal cord or nerve root impingement. (Tr. 22) He noted that although Lusher was obese and had a shoulder impairment, he retained good strength, a functional range of motion, and normal sensation in his extremities. (*Id.*) He noted Lusher retained a normal gait and did not use an assistance device. (*Id.*) He noted Lusher was able to lift up to 25 pounds. (*Id.*) He noted that despite Lusher's coronary artery disease and vertigo symptoms, he was still "able to perform a broad range of activities, including mowing the lawn, pushing snow, driving a car, cooking, and cleaning." (*Id.*) The ALJ noted that Lusher "understandably decided not to take a prescription pain medication," but still underwent a "course of treatment for his impairments [] not fully consistent with his allegations," was not referred for surgery, "only participated in one round of physical therapy," and was not "prescribed a TENS unit or an assistance device." (*Id.*) The ALJ also noted Lusher "admitted he has not sought out work in a different field." (*Id.*) Lusher testified that he could only stand up fifteen minutes (Tr. 127), but he told his physical therapist that he'd been able to "stand up for a couple of hours in the cold at a hockey game." (Tr. 466) The court is required to defer to the ALJ's determination that Lusher's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record.

Lusher attempts to support Dr. Pedro's limitation regarding restrictions from temperature, respiratory irritants, and noise by arguing that he reported experiencing shortness of breath while walking. *See* ECF Doc. 12, Page ID# 903 (citing Tr. 134, 650, 692). However, the evidence of record indicates Lusher's shortness of breath was a symptom of his anxiety and/or due to "moderate exertion," and not a result of or exacerbated by exposure to certain temperatures or respiratory irritants or walking. (Tr. 650, 692)

Lusher attempts to support Dr. Pedro's limitation regarding restrictions on exposure to noise by noting that Dr. Boyce diagnosed him with hearing loss. *See* ECF Doc. 12, Page ID# 903 (citing Tr. 682). But Dr. Boyce's diagnosis did not reveal the severity of the hearing loss or its impact on Lusher's ability to perform basic work activities or any need for Lusher to avoid exposure to noise. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *Kennedy v. Astrue*, 247 Fed. App'x 761, 767 (6th Cir. 2007).

Lusher also cites his own hearing testimony as support for the limitations in Dr. Pedro's medical statement. *See* ECF Doc. 12, Page ID# 903 (citing 125-26, 134) However, as discussed above, the ALJ found Lusher's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 20) Lusher has not challenged this finding.

Lusher cites additional records to support the limitations in Dr. Pedro's medical statement. *See* ECF Doc. 12, Page ID# 904. However, the ALJ's decision indicates that he considered this evidence. For example, Lusher argues that he reported increased pain after shoveling snow. *Id*. (citing Tr. 522, 534). The ALJ noted that Lusher was able to push snow and participated in physical therapy from January 10, 2014, through March 6, 2014. (Tr. 20, 22, 518-551) In those treatment notes, Lusher reported increased low back pain and tightness due to having shoveled snow and "standing up a couple hours in the cold at a hockey game." (Tr. 520,

524, 542) Lusher argues he reported worsened back pain with standing and walking to Dr. Kodsy. ECF Doc. 12, Page ID# 904 (citing Tr. 610). The ALJ discussed the relevant treatment note from Dr. Kodsy. (Tr. 21, 610-1) Lusher argues that Dr. Hochman noted he had an antalgic gait. *See* ECF Doc. 12, Page ID# 904 (citing Tr. 617, 619-20). The ALJ discussed Dr. Hochman's treatment record and noted that Lusher "had an antalgic gait, which he explained caused problems in his back and hip." (Tr. 21, 617) In sum, the ALJ conducted a thorough review of the record and discussed the evidence that supported and conflicted with his RFC determination.

After close and careful review of the ALJ's decision in its entirety, the court finds the ALJ satisfied the goals of the treating physician rule with respect to Dr. Pedro's medical statement, i.e. to ensure the adequacy of review and to permit the claimant to understand the disposition of her case. S*ee Coldiron v. Comm. of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir.2010). In sum, the ALJ provided good reasons supporting his decision to give Dr. Pedro's medical statement "little weight" and to not credit certain limitations in Dr. Pedro's opinion.

### c. Third Party Statements

Lusher argues that the third party statements submitted by his son, daughter, and friend (Mr. Reaser) all supported Dr. Pedro's medical statement. *See* ECF Doc. 12, Page ID# 904. The ALJ discussed and weighed each of these statements. (Tr. 24) The ALJ gave Lusher's son's opinion some weight and noted that the evidence supported a finding that Lusher was limited to a reduced range of light work. (Tr. 24) However, the ALJ found Lusher's son was not an acceptable medical source and the record did not support some of the son's opinions. (*Id.*)

The ALJ also gave Lusher's daughter's opinion some weight because she lived with Lusher and observed him on a daily basis. (Tr. 24) The ALJ found, consistent with the daughter's statement, that the record showed Lusher had exertional and postural limitations and

found it was reasonable to conclude Lusher's pain would distract him.  (*Id.*)  However, the ALJ found the record, including Lusher's imaging studies, physical examinations, treatment regimen, and daily activities, did not support a more restrictive RFC.  (*Id.*)

The ALJ accorded Mr. Reaser's opinion little weight because Lusher's testimony showed that he could lift more than 10 pounds, parts of Mr. Reaser's statement were vague, and Lusher did not allege that he needed to lean against objects.  (Tr. 24)  The ALJ did, however, find that Lusher had exertional and postural restrictions due to the combination of his impairments.

Lusher does not challenge the ALJ's determination regarding or the weight accorded the third party opinions and has not argued that the statements in these third party opinions mandate additional limitations beyond those in the ALJ's RFC determination.  *C.f. Kidd v. Colvin*, No. 1:13-cv-2224, 2014 WL 7238347, at *8 (N.D. Ohio December 17, 2014) ("[E]ven if the ALJ's assessment of the third party opinions was erroneous, the error would be harmless, as Plaintiff has failed to identify how the outcome of his case would be different if the ALJ had assigned great weight to the third party statements.").

### d. Other Arguments Concerning Dr. Pedro's Medical Statement

Lusher argues the ALJ erred by failing to discuss whether Dr. Pedro's medical statement was consistent with Dr. Boyce's opinion.  *See* ECF Doc. 12, Page ID# 900.  Lusher cites 20 C.F.R. § 404.1527(c)(4), which states: "Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."  This regulation does not require the ALJ to compare the opinions of a claimant's physicians.  *C.f. Starin v. Berryhill*, No. 1:16CV01684, 2017 WL 2255283, at *10 (N.D. Ohio May 5, 2017), *adopted by sub nom. Starin v. Comm'r of Soc. Sec.*, No. 1:16CV1684, 2017 WL 2226695 (N.D. Ohio May 22, 2017).  The ALJ gave Dr. Boyce's medical source statement little weight because Dr. Boyce merely "restated his physical examination findings and the claimant's allegations as his opinion"

and did not include his own analysis of Lusher's functional abilities. (Tr. 23, 682) Dr. Boyce concluded that his examination findings, including tenderness to palpation over the low back and right hip, positive straight leg test, and decreased range of motion in the left shoulder with associated weakness, were compatible with degenerative disc disease in the lumbar spine and limited function in the left shoulder due to chronic rotator cuff disease. (Tr. 682) However, Dr. Boyce then stated:

> Given his sites of pain, [Lusher] states that he is able to sit comfortably for a maximum of 20 minutes and stand for a maximum of 20 minutes. He can walk for up to 20 minutes. He reports being able to lift over 50 pounds, but cannot do so above his head due to his left shoulder limitations.

(Tr. 680, 682) The ALJ found that Lusher's statements concerning the intensity, persistence, and limiting effects of his symptoms – such as the statements Dr. Boyce repeated in his opinion – were not entirely consistent with the medical evidence or other evidence of record, and Lusher has not challenged this finding. (Tr. 20) The court finds the ALJ did not err in giving little weight to Dr. Boyce's medical statement, which restated Lusher's own assessment of his limitations. *See Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 838 (6th Cir. 2005) (holding that the ALJ did not err in discounting a treating physician's opinion that was based on "the claimant's subjective statements concerning [claimant's] own limitations").

Lusher argues that "the regulations unambiguously require that '[w]hen the treating source has **reasonable knowledge** of your impairment(s), <u>**we will give the source's opinion more weight**</u> than we would give it if it were from a nontreating source." ECF Doc. 12, Page ID# 901 (quoting 20 C.F.R. § 404.1527(c)(2)(ii))(emphasis in original). Lusher argues that because Dr. Pedro was Lusher's treating physician, he had reasonable knowledge of Lusher's impairments and his opinion should be afforded more weight. *Id*. Although Lusher has correctly

cited 20 C.F.R. § 404.1527(c)(2)(ii) on this point, an ALJ is not required to fully credit a source opinion that is deficient. *C.f. Starin v. Berryhill*, No. 1:16CV01684, 2017 WL 2255283, at *9.

Lusher argues that "Dr. Pedro is board-certified in family medicine" and that "medical specialty is not acknowledged or discussed in the ALJ's decision so it is impossible to know how this weighed in the ALJ's mind." ECF Doc. 12, Page ID# 901. The evidence in the administrative record only indicates that Abraham Pedro, M.D. was a physician who served as Lusher's primary care physician, a fact the ALJ acknowledged. (Tr. 16) Lusher's brief cites a web page[2] outside of the record available to the ALJ. *See* ECF Doc. 12, Page ID# 901, n.2. When considering the denial of a claimant's application for disability insurance benefits, the court normally may only review the administrative record presented to the ALJ. *Salyer v. Comm'r of Soc. Sec.*, 574 F. App'x 595, 597 (6th Cir. 2014). The court may rarely consider evidence outside of the administrative record. *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 839 (6th Cir. 2016) ("consideration of evidence outside the administrative record is proper under some circumstances, *e.g.*, for background information . . . or for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision.") (internal quotation marks omitted). In *Miller*, the Sixth Circuit reversed a district court's decision to consider evidence outside of the administrative record regarding a medical source's credentials. *Id*. at 839-40. Here, the court declines to consider the evidence Lusher cites concerning Dr. Pedro's specialization, because that information was not part of the administrative record. *See Miller*, 811 F.3d at 839-40. Further, even if the court were to consider Dr. Pedro's alleged status as a physician board-certified in

---

[2] Lusher's brief cites:
https://doctors.mercy.com/provider/Abraham+O+Pedro/244607?unified=abraham%20pedro&sort=networks%2Crelevance&filter%5B%5D=network_affiliations.name%3AMercy%20Medical%20Partners%20-%20Lorain&tt=8832f5b4-bfff-4dc5-8fb5-f36380bf679e&ut=735ee31c-ff7b-4949-b8eb-bb46bb2df378&timestamp=2018-01-09T17%3A14%3A19.217Z. *See* ECF Doc. 12, Page ID# 901.

family medicine, his opinion would still not necessarily be controlling; "specialization" is only one factor for the ALJ to consider. *See Fagan v. Astrue*, No. 1:09 CV 00019, 2010 WL 481278, at *6 (N.D. Ohio Feb. 5, 2010) (citing 20 C.F.R. § 404.1527(d)).

Lusher argues "rejecti[ng] a medical expert's opinion as inconsistent with his *own findings and reports* is simply an impermissible substitution of the ALJ's lay opinion for that of the treating expert." *See* ECF Doc. 12, Page ID# 902. Courts in this Circuit have found that substantial evidence can support an ALJ's finding that an expert's opinion is inconsistent with his own treatment notes. *See, e.g., Bullock v. Astrue*, No. CIV.A. 11-90-GWU, 2011 WL 5900715, at *4 (E.D. Ky. Nov. 23, 2011); *Taylor v. Astrue*, No. 3:09-CV-229, 2010 WL 2680105, at *6 (S.D. Ohio June 2, 2010), *adopted by sub nom. Taylor v. Comm'r of Soc. Sec.*, No. 3:09-CV-229, 2010 WL 2680102 (S.D. Ohio July 6, 2010); *Couch v. Astrue*, No. CIV.A. 07-68-JBC, 2009 WL 773286, at *5 (E.D. Ky. Mar. 23, 2009); *Prater v. Comm'r of Soc. Sec.*, No. 3:07CV020, 2008 WL 839784, at *12 (S.D. Ohio Mar. 27, 2008). The cases Lusher cites, *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181(6th Cir. 2009), and *Isaacs v. Astrue*, No. 1:08-CV-00828, 2009 WL 3672060, (S.D. Ohio Nov. 4, 2009), do not support his argument.

In *Simpson v. Comm'r of Soc. Sec.*, 344, Fed. App'x at 194, the court found "the ALJ substituted [the expert's] medical opinion with his own in determining the degree of pain resulting from the condition from which [the claimant] suffere[d], and did not merely rely upon the claimant's testimony as to her daily activities or another doctor's testimony as to her condition." Here, the ALJ gave little weight to Dr. Pedro's opinion because it was inconsistent with the bulk of evidence in the record, including Dr. Pedro's own treatment notes and the opinions of reviewing physicians (Tr. 22-23), not because the ALJ independently found Lusher's claims of pain were inconceivable and implausible as the ALJ did in *Simpson*.

In *Isaacs v. Astrue*, 2009 WL 3672060, at *10, the court was unable to determine the record basis for the ALJ's determination that the claimant could perform medium work. The court found the ALJ's RFC lacked substantial support in the record because "the ALJ rendered her RFC finding for medium work without reference to any medically determined RFC opinion bridging the raw medical data to specific functional limitations." *Id.* at *11. The ALJ's unsupported RFC determination in *Isaacs* is different from the present case, because here the opinions of the state agency physicians, Drs. Hughes and Manos, both supported the ALJ's determination. (Tr. 169-70, 187-88) The ALJ gave partial weight to the opinions of Drs. Hughes and Manos because the ALJ found the medical evidence in the file supported their opinions. (Tr. 23-34)

Lusher argues without citation of authority that "[i]t is improper to find a medical opinion regarding how a claimant would function during competitive work defective because the claimant may appear more functional during examination in an office." *See* ECF Doc. 12, Page ID# 18-19. However, "it is for the ALJ, and not the Court, to determine whether a medical opinion is reasonable." *C.f. Blevins v. Comm'r of Soc. Sec.*, No. 2:15-CV-2685, 2016 WL 4035189, at *4-5 (S.D. Ohio July 28, 2016), *adopted by*, No. 2:15-CV-2685, 2016 WL 5118305 (S.D. Ohio Sept. 20, 2016) As discussed above, the ALJ provided good reasons for giving little weight to Dr. Pedro's opinion.

## 1. Dr. Pedro's Off-task Questionnaire

### a. The ALJ considered Dr. Pedro's off-task questionnaire in relation to Lusher's mental and physical impairments

Lusher contends the ALJ erroneously considered Dr. Pedro's off-task questionnaire only in relation to his mental impairments. *See* ECF Doc. 12, Page ID# 898. This argument lacks merit. Although the ALJ addressed Dr. Pedro's off-task opinion in his analysis regarding

Lusher's mental disorders (Tr. 17), the ALJ noted that Dr. Pedro considered both Lusher's mental and physical conditions, including anxiety, sleep apnea, fatigue and side effects from medication, and severe pain. (Tr. 17, 722) The ALJ stated that he did not give the decision controlling weight.

> Dr. Pedro opined that the claimant was likely to be off task at least 20% of the time. He was unable to concentrate due to anxiety, would need to lie down due to sleep apnea, would be fatigued by side effects from his medication, and suffer from severe pain. He was expected to absent more than four times a month (Exhibit 26F, page 2). Dr. Pedro is a treating source. However, his opinion is not entitled to controlling weight as his statement is not consistent with the evidence of record. In particular, Dr. Pedro's own treatment notes show that the claimant has not reported any symptoms from his depression or anxiety for nearly two years. He has not reported significant side effects from his medication. The claimant has followed up on his sleep apnea on just on occasion since his alleged onset date, and his CPAP was noted to improve his symptoms at his 2016 sleep study. The claimant's anxiety and depression have been managed on medication alone for nearly two years. He has not required any psychiatric hospitalization. Instead, the claimant's mental status evaluations during the period at issue have also been generally unremarkable.

(Tr. 17) Dr. Pedro's off-task questionnaire listed several underlying mental and physical ailments, including chronic low back pain, muscle twitching, upper and lower extremity weakness, depression, panic disorder, and rotator cuff syndrome. (Tr. 722) The ALJ did not discuss these underlying mental and physical impairments in his discussion of the off-task questionnaire, but did address them in other parts of his decision. The ALJ addressed the evidence concerning Lusher's chronic low back pain (Tr. 18-21), muscle twitching (Tr. 15, 20), weakness in upper and lower extremities (Tr. 20, 21), depression (Tr. 15-17), panic disorder (Tr. 15-17), and rotator cuff syndrome (Tr. 18, 20-22). Reading the ALJ's opinion as a whole, the conclusion is inescapable that the ALJ's consideration of the off-task questionnaire was not limited to his evaluation of Lusher's mental impairments.

### b.     The ALJ's failure to assign weight to Dr. Pedro's off-task questionnaire was harmless error

Lusher argues that the ALJ failed to evaluate the off-task questionnaire under the two-part inquiry for treating source opinions.  *See* ECF Doc. 12, Page ID# 899.  Lusher argues that after declining to give the opinion controlling weight, "the ALJ failed to *continue* the inquiry and properly evaluate the § 404.1527 factors *at all*."  *Id.* (emphasis in original).

"If an ALJ does not give good reasons for rejecting the opinion of a treating source, remand and reversal may not be required if the violation has only been *de minimis*."  *Wilson*, 378 F.3d at 547.  A reversal may not be warranted "whe[n] the Commissioner has met the goal of [§ 1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation."  *Wilson*, 378 F. 3d at 547; *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010); *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470–72 (6th Cir.2006).

The ALJ discussed Dr. Pedro's off-task questionnaire, but did not explicitly state the weight he gave to the opinion.  But, as discussed above, the ALJ's discussion of other evidence made it clear that he considered the examining and treatment relationship between Lusher and Dr. Pedro and, to the extent the record reflected it, Dr. Pedro's specialization.  (Tr. 16, 17)  The ALJ did not explicitly discuss the frequency or length of the treatment relationship.

The ALJ also expressly stated good reasons for finding the off-task questionnaire to not be consistent with the evidence of record.  (Tr. 17)  For example, Dr. Pedro opined Lusher would be off task due to anxiety.  (Tr. 722)  The ALJ noted that Dr. Pedro's own treatment notes showed that Lusher had not reported any symptoms from his depression or anxiety for nearly two years.  (Tr. 16-17, 644-46, 656, 660, 675, 690, 694, 712, 797)  Rather, the medical records indicated that Lusher's anxiety and depression had been managed with medication (Tr. 15-17,

408, 644-46, 656), he had not required any psychiatric hospitalizations (Tr. 17, 672), and his

mental status evaluations during the relevant period had been generally unremarkable.  (Tr. 17,

714, 798, 807)  Before October 22, 2015 (the date Lusher had Dr. Pedro fill out his disability

forms – Tr. 805, 807-08), Lusher had last reported symptoms of depression or anxiety on March

27, 2014 (Tr. 652).  At the next appointment after Dr. Pedro completed the disability paperwork,

Lusher again reported no symptoms of anxiety or depression.  (Tr. 797)

Dr. Pedro also opined Lusher would need to lie down due to sleep apnea.  (Tr. 722)  The

ALJ noted Lusher had followed up on his sleep apnea on just one occasion since his alleged

onset date, and a 2016 sleep study showed a CPAP device improved his condition.  (Tr. 17, 793)

Dr. Pedro opined that Lusher would likely be off-task due to side effects from his

medications, including drowsiness and fatigue.  (Tr. 722)  But the ALJ noted Lusher had not

reported any significant side effects from his medications.  (Tr. 14-15, 17, 643, 652, 659, 711,

796)  Although Lusher once complained of weight gain as a side effect of Cymbalta (Tr. 650),

the medical records do not indicate that Lusher suffered from drowsiness or fatigue as a side

effect of medications.

The goal of 20 C.F.R. § 404.1527(c) has been met in this case even though the ALJ may

not have expressly complied with the exact terms of the regulation.  The ALJ directly discussed

Dr. Pedro's off-task opinion and found it was inconsistent with the record as a whole.  *C.f.*

*Nelson*, 195 F. App'x at 472 (finding the ALJ's analysis of the claimant's mental problems

adequately addressed the treating sources' opinions "by indirectly attacking both the consistency

of those opinions with the other record evidence and their supportability.").  Further, the ALJ

provided a detailed discussion of objective medical evidence, functional capacity findings, and

Lusher's credibility.  The sum of the ALJ's analyses of Lusher's conditions and capabilities

provided substantial evidence for his decision to discount Dr. Pedro's off-task questionnaire opinions.

### B.     The ALJ's Step Two Analysis Regarding Lusher's Migraine Headaches

Lusher argues that the ALJ erred by failing to conclude that his migraine headaches were a severe impairment. *See* ECF Doc. 12, Page ID# 906. The commissioner counters that "[t]he ALJ properly incorporated into the RFC only those limitations that he found credible." *See* ECF Doc. 13, Page ID# 927.

A severe impairment is one that significantly limits a claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. §§ 1520(c); 920(c). "Basic work activities" are "the abilities and aptitudes necessary to do most jobs," including: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 1522(b); 922(b). Lusher bears the burden of demonstrating that he suffers from severe impairments. *See Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994) (claimant bears burden during first four steps).

"After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not "severe."'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (emphasis in original) (quoting Soc. Sec. Rul. 96–8p, 1996 WL 374184, at *5). "And when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does 'not

constitute reversible error.'" *Id.* (quoting *Maziarz v. Sec'y of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir.1987)).

The ALJ found that Lusher's migraine headaches were not a severe impairment:

> The record shows that the claimant has a history of headaches that were controlled with use of Neurontin ([Tr. 429]). After several years without reporting any symptoms, the claimant followed up on his headaches on July 10, 2015. Norman Sese, M.D., the claimant's neurologist, increased the claimant's dose of Neurontin ([Tr. 699]). At his September 16, 2015 follow up appointment with Dr. Sese, the claimant reported that Neurontin had improved his headaches ([Tr. 703]). He was alert and oriented during his evaluation. He appeared to be in no acute distress ([Tr. 703]). In October 2015, the claimant reported his symptoms continued to be improved with use of Neurontin. His evaluation was unremarkable ([Tr. 749]). The record shows that the claimant was continued on Neurontin after his January 6, 2016 appointment ([Tr. 785-87]). The record does not show that the claimant's headaches are causing any significant work-related limitations. They are nonsevere.

(Tr. 15)

Lusher argues that his headaches were not controlled with Neurontin, based on his testimony that Neurontin only "takes the edge off the migraines" and because he still experiences migraines despite taking Neurontin. *See* ECF Doc. 12, Page ID# 907 (citing Tr. 139-40). Lusher's testimony at the administrative hearing was not consistent with the information he reported to his medical providers, as the ALJ's decision noted. (Tr. 15, 429, 431, 699, 703, 749, 786) For instance, on July 31, 2012, Lusher told Dr. Pedro that he was "doing well and his headaches were controlled with Neurontin 300 mg once daily." (Tr. 429) On July 10, 2015, after having not seen Dr. Sese for almost three years, Lusher complained of more frequent headaches, and Dr. Sese increased the dosage of Neurontin to 300 mg twice daily. (Tr. 699) Two months later, Lusher told Dr. Pedro that Neurontin had been helping him with his headaches. (Tr. 703) On October 28, 2015, Lusher told Dr. Sese that he had been "doing okay" and that "Neurontin continue[d] to help." (Tr. 749) On January 6, 2016, Lusher reported to Dr. Pedro that he would continue taking gabapentin (Neurontin), which continued to help. (Tr. 786)

Substantial evidence supports the ALJ's finding that Lusher's headaches were controlled with Neurontin.

The ALJ also specifically found that Lusher's degenerative disc disease, obesity, coronary artery disease, dysfunction of a major joint, and vertigo qualified as severe impairments. (Tr. 14) Lusher therefore cleared Step Two of the analysis. *See Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).

Even if the ALJ erred at step two, the ALJ's consideration of the cumulative effect of Lusher's impairments (both severe and non-severe) throughout the remaining steps of the analysis rendered harmless any error in not classifying the migraine headaches as severe. *See Nejat*, 359 F. App'x at 577. Even though the ALJ found that Lusher's migraine headaches were not a severe impairment, he still incorporated limitations into the RFC that accounted for Lusher's migraines. (Tr. 23) The ALJ also included these limitations in the hypotheticals he posed to the VE. (Tr. 145-46, 153) The RFC limited Lusher from working around hazards and operating commercial vehicles as part of his work duties, as an accommodation for Lusher's migraine headaches and other conditions. (Tr. 23) The ALJ further stated that Lusher's RFC "includes the need to be off task less than 10% of the workday due to the combination of symptoms from his impairments." (*Id.*) Lusher argues that the ALJ's decision contains no indication that the "combination of symptoms from [Lusher's] impairments" included Lusher's migraines at all. But the ALJ discussed these limitations in the same paragraph in which he addressed Dr. Sese's Headache RFC opinion as well as the medical record regarding Lusher's headaches. The context plainly indicates that the ALJ included these limitations, at least in part, due to Lusher's migraine headaches. (Tr. 23)

Lusher argues the RFC finding did not account for his limitations in the context of a full-time work schedule, because he "experiences about 15 headaches a month" and, due to the

photosensitivity that accompanies his migraines, "he needs to retreat to a dark, quiet room for the 1 to 1½ hour[s] during which the migraine lasts." *See* ECF Doc. 12, Page ID# 908 (citing Tr. 140, 725-26). Lusher argues "there is no logical bridge" from the evidence to the "less than 10% off task" limitation, because he testified that his migraine headaches last exactly one hour. *Id*. at 909 (citing Tr. 140). As an initial matter, the court notes that Lusher fails to cite to any record evidence indicating that his migraine headaches were 1.5 hours in duration. Dr. Sese opined that Lusher's headaches were typically approximately a half hour in duration (Tr. 725), and Lusher testified that his migraines lasted a minimum of an hour. (Tr. 140) The ALJ found that Lusher's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence of record. (Tr. 20) Lusher does not challenge the ALJ's finding regarding his subjective statements. Further, as stated above, Lusher's hearing testimony regarding the severity, persistence, and intensity of his migraine headaches (Tr. 139-40) was inconsistent with the statements he made to Dr. Sese and Dr. Pedro about Neurontin controlling and improving his headaches. (Tr. 15, 429, 699, 703, 749, 786)

The ALJ also noted that Dr. Sese opined that Lusher had 15 headaches a month that were 30 minutes in duration and that Lusher would be precluded from performing even basic work activities during a headache. (Tr. 23, 725-27) The ALJ gave Dr. Sese's opinion little weight because he found the record did not support the opinion. (Tr. 23) The ALJ noted that Lusher's headaches were well controlled with medication, Lusher was alert and oriented at appointments, and he had not been observed to be experiencing any migraines or photophobia at appointments. (Tr. 23) Dr. Sese also failed to identify any positive test results or objective signs of Lusher's headaches, even though Dr. Sese's check box "Headache Residual Functional Capacity" form contained a question explicitly seeking such information. (Tr. 726)

Lusher also argues that, because Dr. Sese was the only physician of record to examine him and offer an opinion on his migraine headache limitations, the ALJ's rejection of Dr. Sese's opinion was an "impermissible lay interpretation of raw medical data."  (Tr. 24)  Lusher cites *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) to support his argument. In *Simpson* the Sixth Circuit rejected the ALJ's finding that the physician's medical opinion was implausible because the ALJ based the decision on the ALJ's independent determination regarding the degree of pain resulting from the claimant's condition.  *See Simpson*, 344 F. App'x at 194.  Unlike *Simpson*, the ALJ here gave little weight to Dr. Sese's opinion because the record, including Lusher's own statements to his physicians, indicated that Lusher's migraine headaches were well controlled and improved with medication.  (Tr. 15, 23, 429, 699, 703, 749, 786)

Substantial evidence supports the ALJ's RFC determination, including his determination that Lusher's migraine headaches were not a severe impairment.  Any error in the failure to include migraine headaches as a severe impairment was harmless because it is very apparent that the ALJ both considered and made allowance for the migraine headaches in making his RFC determination.

## VI.    CONCLUSION

Because (i) the ALJ properly applied the treating source rule and (ii) substantial evidence supports the ALJ's analysis at Step Two regarding plaintiff's migraine headaches, Lusher has not demonstrated a basis upon which to reverse or remand the commissioner's decision.  Because the commissioner's decision was supported by substantial evidence the final decision of the commissioner is AFFIRMED.

IT IS SO ORDERED.

Dated: July 5, 2018

Thomas M. Parker
United States Magistrate Judge